**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Tera Larae Wilson,

Plaintiff,

v.

Commissioner of Social Security Administration,

Defendant.

No. CV-25-03338-PHX-DWL

**ORDER**

Plaintiff challenges the denial of her application for benefits under the Social Security Act ("the Act") by the Commissioner of the Social Security Administration ("Commissioner"). The Court has reviewed Plaintiff's opening brief (Doc. 19), the Commissioner's answering brief (Doc. 21), and Plaintiff's reply (Doc. 22), as well as the Administrative Record (Doc. 13, "AR"), and now affirms the Administrative Law Judge's ("ALJ") decision.

I. <u>Procedural History</u>

In August 2013, Plaintiff applied for benefits and alleged a disability onset date of August 1, 2005. (AR at 2156.) In May 2016, an ALJ concluded that Plaintiff was not disabled. (*Id.*) Plaintiff appealed to this Court, and her appeal was docketed as *Wilson v. Comm'r of Soc. Sec. Admin.*, No. 2:18-cv-01034-DLR ("*Wilson I*"). In August 2019, Judge Rayes reversed and remanded for further proceedings, "which will include reassessing the opinions of nurse practitioners Pray and Hammond, reassessing the credibility of Plaintiff's testimony, and adjusting the residual functional capacity presented to a vocational expert

as necessary." (*Wilson I*, Doc. 20 at 6.)

On September 30, 2020, following a post-remand hearing, an ALJ issued a second unfavorable decision. (AR at 2156.) Plaintiff appealed for a second time to this Court, and her appeal was docketed as *Wilson v. Comm'r of Soc. Sec. Admin.*, No. 2:21-cv-00518-SMB ("*Wilson II*"). In September 2022, Judge Brnovich reversed and remanded for further proceedings, concluding that the ALJ erred both when evaluating Plaintiff's symptom testimony and when discrediting the opinions of Dr. Hunt. (*Wilson II*, Doc. 27 at 4, 6-7.)[1]

On May 30, 2024, following post-remand hearings during which Plaintiff amended the alleged onset date to August 14, 2013, an ALJ issued a third unfavorable decision. (AR at 2156-84.) This is the decision at issue in this appeal. The Appeals Council later denied review. (*Id.* at 2141-44.)

II. The Sequential Evaluation Process and Judicial Review

To determine whether a claimant is disabled for purposes of the Act, the ALJ follows a five-step process. 20 C.F.R. § 416.920(a). The claimant bears the burden of proof at the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant has engaged in substantial, gainful work activity. 20 C.F.R. § 416.920(a)(4)(i). At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. *Id.* § 416.920(a)(4)(ii). At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. *Id.* § 416.920(a)(4)(iii). If so, the claimant is disabled. *Id.* If not, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to step four, where the ALJ determines whether the claimant is still capable of performing past relevant work. *Id.* § 416.920(a)(4)(iv). If not, the ALJ proceeds to the fifth and final step, where the ALJ determines whether the claimant can perform any other work in the national

[1] In contrast, Judge Brnovich found no harmful error in the ALJ's evaluation of the opinions of NP Pray and HP Hammond. (*Wilson II*, Doc. 27 at 5-7.)

economy based on the claimant's RFC, age, education, and work experience. *Id.* § 416.920(a)(4)(v). If not, the claimant is disabled. *Id.*

An ALJ's factual findings "shall be conclusive if supported by substantial evidence." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (internal quotations omitted). The Court may set aside the Commissioner's disability determination only if it is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* Generally, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). In determining whether to reverse an ALJ's decision, the district court reviews only those issues raised by the party challenging the decision. *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).

III. The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial, gainful[2] work activity since the alleged onset date and that Plaintiff had the following severe impairments: "obesity, diabetes, hypertension, degenerative joint disease of the knee, asthma, obstructive sleep apnea, congenital abnormality of the left ear, status post left knee arthroscopic femoral chondroplasty and meniscectomy (May 2020), hypothyroidism, vascular insufficiency, a history of amphetamine and other psychostimulant dependence, bipolar disorder, borderline personality disorder, posttraumatic stress disorder (PTSD)." (AR at 2160-61.)[3] Next, the ALJ concluded that Plaintiff's impairments did not meet or medically

---

[2] The ALJ noted that there were "significant inconsistencies in the record regarding [Plaintiff's] work after the amended onset date," provided a detailed summary of Plaintiff's seeming work activities, and noted that "it is difficult to avoid the conclusion she was working" before clarifying that "[i]n order to proceed with the sequential evaluation process, the undersigned will presume [Plaintiff's] earnings were below the level necessary to constitute substantial gainful activity. However, . . . her reported activity strongly supports the conclusion reached in this decision she was not as limited as alleged." (AR at 2160-61.)

[3] The ALJ also determined that Plaintiff had the non-severe impairments of visual impairment, headaches, hypocholesteremia, lung nodule, and fatty infiltration of the liver. (AR at 2162.)

equal a listing. (*Id*. at 2162.) Next, the ALJ calculated Plaintiff's RFC as follows:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: The claimant can lift and carry 20 occasionally and 10 pounds frequently. The claimant can stand and or walk with normal breaks for 4 hours and sit for 6 hours with normal breaks. The claimant can occasionally climb ramps and stairs but never climb ladders, ropes and scaffolds. The claimant can frequently balance and stoop; occasionally kneel and crouch and frequently crawl. The claimant should not have concentrated exposure to extreme cold, extreme heat, wetness, loud noise, fumes, odors, dusts, gases, poor ventilation and no exposure to hazards such as moving machinery and unprotected heights. The claimant can perform simple, routine, repetitive work tasks involving simple work related decisions with simple instructions. The claimant cannot perform fast paced production rate work.

(*Id.* at 2164.)

As part of this RFC determination, the ALJ provided an exhaustive evaluation of Plaintiff's symptom testimony (*id.* at 2165-72), concluding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.* at 2167.) The ALJ also provided an evaluation of the voluminous opinion evidence in the record, concluding as follows: (1) Marilyn Orenstein, M.D., state agency reviewing consultant ("given partial weight"); (2) Jerry Dodson, M.D., state agency reviewing consultant ("given partial weight"); (3) David Yandell, Ph.D., psychiatric consultant ("given partial weight"); (4) Stephen Bailey, Ed.D., psychiatric consultant ("given partial weight"); (5) Carol Hutchinson, D.O., medical consultant ("given partial weight"); (6) Dennis Swena, M.D., medical consultant ("given partial weight"); (7) Cristobal Eblen, Ph.D., psychiatric consultant ("given little weight"); (8) Jaine Foster-Valdez, Ph.D., psychiatric consultant ("given little weight"); (9) Ronald M. Glick, D.O. ("given minimal weight"); (10) Matthew Khumalo, M.D., consultative examiner ("given minimal weight"); (11) Jonna Krabbenhoft, M.D., consultative examiner ("given minimal weight"); (12) Stephen Pray, N.P., treating mental health provider ("unable to assign more than minimal weight"); (13) Matthew Khumalo, M.D.,

consultative examiner, second examination ("given only partial weight"); (14) Thang Nguyen, M.D. ("given no weight"); (15) Brandy Hammond, N.P. ("given minimal weight"); (16) Jonna Krabbenhoft, M.D., consultative examiner, second examination ("given limited weight"); (17) Kari Coelho Psy.D., consultative examiner ("given partial weight"); (18) Keith Cunningham, consultative examiner ("assigned partial weight"); (19) Richard Nguyen, M.D. ("assigned minimal weight"); (20) Judith Hunt, M.D. ("assigned minimal weight"); (21) Diane Scott, PA ("given minimal weight"); and (22) Linda Miller, D.O., independent medical expert ("given great weight"). (*Id.* at 2172-82.) Additionally. the ALJ considered third-party reports from Plaintiff's sister and mother and deemed their statements "not persuasive of additional limitations in the RFC" and "given little weight." (*Id.* at 2182.)

Based on the testimony of a vocational expert ("VE"), the ALJ concluded that although Plaintiff had no past relevant work, she would be able to perform two jobs that exist in significant numbers in the national economy: (1) document preparer; and (2) auditing clerk. (*Id.* at 2182-83.) Thus, the ALJ concluded that Plaintiff was not disabled. (*Id.* at 2183-84.)

IV. Discussion

Plaintiff raises three issues on appeal: (1) whether the ALJ failed to provide specific and legitimate reasons for rejecting the opinions of Dr. Hunt; (2) whether the ALJ failed to provide germane reasons for rejecting the opinions of NP Pray; and (3) whether the ALJ failed to provide germane reasons for rejecting the opinions of NP Hammond. (Doc. 19 at 1.) Plaintiff argues that "[r]emand for calculation of benefits would be an appropriate remedy in this case. Only in the alternative should this Court remand for further administrative proceedings." (*Id.* at 27.)

A. **Dr. Hunt**

1. Standard Of Review

In January 2017, the SSA amended the regulations concerning the evaluation of medical opinion evidence. *See Revisions to Rules Regarding Evaluation of Medical*

*Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). However, the new regulations only apply to applications filed on or after March 27, 2017. Plaintiff's applications were filed in August 2013, so the old regulations remain applicable.

Under the old regulations, there is a hierarchy among the sources of medical opinions. Those who have treated a claimant are treating physicians, those who examined but did not treat the claimant are examining physicians, and those who neither examined nor treated the claimant are nonexamining physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who did not treat the claimant." *Id.* This is because treating physicians have the advantage of in-person interaction and typically a longer history of treatment than a claimant's other doctors, and their "subjective judgments . . . are important, and properly play a part in their medical evaluations." *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

Given this hierarchy and a treating physician's position at the top if it, under the old regulations, an ALJ may reject uncontroverted evidence from a treating physician "only for 'clear and convincing' reasons." *Lester*, 81 F.3d at 830. Alternatively, and as here, "[e]ven if the treating doctor's opinion is contradicted by another doctor, the [ALJ] may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Id.* (citation omitted). Normally, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of . . . a treating physician." *Id.* at 831. But where "the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating physician may itself be substantial evidence." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). When that is the case, an ALJ can satisfy the burden of providing specific and legitimate reasons "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir. 1989); *see also Embrey*, 849 F.2d at 421-22 ("The ALJ must do more

than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.").

2. The ALJ's Evaluation Of Dr. Hunt's Opinions

The ALJ concluded that "minimal weight" should be afforded to Dr. Hunt's opinions. (AR at 2179-81.) The ALJ provided the following lengthy, four-paragraph explanation for this determination:

> The undersigned considered the opinions of Judith Hunt, M.D. (Exs. 44F, 45F, 58F, 68F, 69F). On October 31, 2019, Dr. Hunt completed a Medical Assessment. She stated her impairments were bipolar manic/depression, borderline personality disorder, diabetes, morbid obesity, severe obstructive sleep apnea with insomnia, polypharmacy and hallucinations (Exhibit 44F). She stated the claimant could sit six hours, stand/walk less than two hours lift carry less than 10 pounds. It was not necessary to alternate positions but with position changes she would need to rest for 15 plus minutes. The claimant could frequently use her hands, occasionally reach and less than occasionally bend and stoop. Dr. Hunt stated the claimant's impairments would cause cognitive or pace limitations and would inhibit the completion of more than one to two step job duties over an 8 hour day. The limitation would cause interruption of a work pace with the claimant being off task to a moderately severe degree and contribute to mental fatigue more than four times per month when she would need to rest one to two hours at a time. She would miss work six plus days per month.
>
> On May 1, 2020, Dr. Hunt reported the claimant has audiovisual hallucinations, bipolar disorder, borderline personality disorder, bilateral knee pain and excessive daytime sleepiness (Exhibit 58F). She opined the claimant could sit for two hours, stand and walk less than two hours, and lift and carry more than ten but less than fifteen pounds. She opined the claimant needed to alternate between sitting, standing and walking every one to twenty minutes with a fifteen-minute rest with position changes. She could occasionally use her hands and reach, and less than occasionally bend and stoop. She had cognitive or pace limits that inhibited her from completing more than one to two-step job duties over an[] eight-hour day and would be off task to a severe degree. The claimant would need to rest one to two hours at a time more than four times a month. She would need to rest one to two hours at a time. Dr. Hunt also opined the claimant had mental health issues, which caused total disability. Dr. Hunt's opinions are assigned minimal weight. Dr. Hunt reported the claimant had to change position every one to twenty minutes with a fifteen-minute rest period with position changes, but there has been no discussion of this in any treatment record. The claimant's

orthopedist released her to normal activities shortly after knee surgery in 2020. Moreover, Dr. Hunt stated the claimant could use her hands and reach less than occasionally, but there is no explanation regarding why she would have this restriction. These opinions are inconsistent with the weight of opinion evidence regarding the use of the claimant's upper extremities, which raises the question whether additional information provided is similarly unreliable. Dr. Hunt's opinions regarding the claimant's mental health limitations is assigned minimal weight as she has provided an opinion outside of her area of expertise. The District Court held that discounting the opinions is appropriate when the opinion is made outside of one's expertise (Ex. 18A/6). The District Court further noted that the ALJ relied on the fact that no doctor had observed any signs or symptoms of psychosis when she stated that there was no explanation anywhere in the record that one would expect to see those signs. Absent medical corroboration for the ALJ's opinion on that issue the District Court found error. However, at the remand hearing, the medical expert, Dr. Miller, addressed the issue of psychosis. Dr. Miller testified that there were no signs in the record of hallucinations other than the claimant's self-reports. She stated that the overall evidence does not support a finding of hallucinations or psychotic disorder. In support of this statement, she referred to the claimant's mental health record and noted the claimant's mental health providers do not agree that she has hallucinations as there is no evidence of chronic hallucinations or psychotic disorder in the claimant's chart notes.

On April 12, 2023, Dr. Hunt reported the claimant had audiovisual hallucinations, bipolar disorder, borderline personality disorder, bilateral knee pain and excessive daytime sleepiness (Exhibit 69F). She opined the claimant could sit for two hours, stand/walk less than two hours and lift and carry more than 10 pounds and less than 15 pounds. She opined it was medically necessary for the claimant to alternate positions every 1 to 20 minutes and rest for 15 minutes with position changes. She could use her hands occasionally and bend and stoop less than occasionally and reach occasionally. She opined the claimant's impairments caused cognitive or pace limitations that inhibited the completion of more than one and two-step job duties over an eight-hour day and she would be off task to a severe degree. The claimant would miss work six days per month. She further opined that the claimant had mental health issues causing total disability. Dr. Hunt also completed a Medical Assessment of the claimant's abilities to perform work related activities (mental) and stated the claimant had severe estimated degree of deterioration in personal habits, severe limitation in her ability to understand, carry out and remember instructions, respond appropriately to coworkers, respond to customary work pressures and perform simple tasks. The claimant had side effects from medication such

> as dizziness, confusion, brain fog and diarrhea which resulted in a moderately severe limitation. She had severe limitation due to a general medical condition. Her psychiatric symptoms affected the sustainability of work pace.
>
> The opinions provided by Ms. Hunt are assigned minimal weight. Ms. Hunt is a primary care provider at Ponderosa Family Clinic. Her treatment notes . . . do not support the severe restrictions she provided in her opinions. She saw the claimant for well woman exams and routine medication management appointments which revealed normal findings. Dr. Hunt stated the claimant had mental health issues causing total disability. However, as discussed elsewhere in the decision the claimant has reported working for her sister performing childcare which is inconsistent with this statement (Exs. 65F/53, 63, 66, 121, 123, 150, 168, 67F/5, 72F/29. Moreover, Dr. Hunt is a primary care physician and has offered an opinion outside of her area of expertise. The records from SW Behavioral Health, where the claimant receives mental health treatment, do not support a finding that she is unable to perform all work. Dr. Hunt stated the claimant required frequent position changes and rest with position changes. However, this is not reflected in her treatment records or discussed during treatment. She stated the claimant could occasionally use her hands but there is minimal evidence in treatment records regarding discussion or concern about use of the hands. This is not addressed by the orthopedist and there is no explanation about this limitation. Examinations performed by Dr. Hunt revealed normal upper extremity motor strength (Ex. 54F/24). Dr. Hunt stated the claimant had side effects of medication. However, the alleged confusion and brain fog noted are not observed during treatment or discussed. These symptoms are not observed by treating mental health providers. Dr. Hunt indicated she had diarrhea and while this is noted in her treatment records, this did not persist for any 12-month time period (Ex. 70F/18, 22). Further, treatment records with Dr. Hunt indicate the claimant had normal cognition. On February 6, 2019, Dr. Hunt conducted a depression screening and the claimant denied difficulty concentrating on things such as reading. Her cognitive function was intact, judgement and insight were good, and she had a full range of mood/affect (Ex. 54F/24).

(*Id.*)

3. <u>The Parties' Arguments</u>

Plaintiff argues that the ALJ failed to provide specific and legitimate reasons, supported by substantial evidence, for discrediting Dr. Hunt's opinions. (Doc. 19 at 24-27.) First, Plaintiff argues that "[t]he ALJ's discounting of Dr. Hunt's mental capacities

assessment because she was not a psychiatric provider is directly contrary to Ninth Circuit precedent in effect pre-2017, which states a treating doctor's opinion is accorded deference because of her relationship with the patient, aside from any special qualifications." (*Id.* at 25, citing *Benton v. Barnhart*, 331 F.3d 1030, 1036 n. 1 (9th Cir. 2003)). Second, Plaintiff argues that the mere fact her "providers did not note *observations* of [her] hallucinations does not discount [her] consistent report of both auditory and visual hallucinations, or the fact that treating providers ordered trials of over 10 psychotropic medications during [her] extensive course of treatment to address this and [her] other symptoms. The ALJ relies on the opinion of the medical expert at the 2024 hearing, but that is one doctor who never saw or treated [her], and apparently believed that to be considered valid, [she] would have had to actively been experiencing hallucinations in the presence of a provider (and the provider would have to therefore 'observe' them) for the hallucinations to be considered valid." (*Id.* at 26.) Third, Plaintiff argues that the mere fact she "watched her sister's children later in the relevant period for an undetermined amount of time both per day and per week does not automatically show that Dr. Hunt's assessments were invalid. This issue is discussed throughout the ALJ's decision, and the ALJ fails to show specifically how [her] caretaking of family members was inconsistent with Dr. Hunt's or any other medical provider's opinions. That [she] attempted to help her sister with her sister's children for an unspecified portion of time within the past 12 years, whether she earned money for this or not (unknown, unquantified), fails to rise to the level of specific and legitimate reasons to reject Dr. Hunt's assessed limitations." (*Id.* at 26-27.)

In response, the Commissioner defends the sufficiency of the ALJ's rationale for discrediting Dr. Hunt's opinions. (Doc. 21 at 9-12.) First, the Commissioner argues that "Dr. Hunt's own treatment records failed to support her opinions," as "the ALJ identified a February 2019 depression screening where Dr. Hunt noted 'minimal depression,' as well as intact cognitive functioning, good judgment and insight, and full range mood/affect. The ALJ also noted Dr. Hunt documented normal cognition. Such findings specifically undermine Dr. Hunt's opinion that Plaintiff had disabling cognitive or pace limitations."

(*Id.* at 10.) Second, the Commissioner argues that it was permissible for the ALJ to find that "Dr. Hunt's opinions were also inconsistent with Plaintiff's ability to care for her sister's and cousin's children, which included helping with online schooling and caring for a toddler, who needed potty training." (*Id.*) Later, the Commissioner adds: "While Plaintiff downplays her ability to provide childcare, the record shows that it was quite extensive. Moreover, the ability to watch young children and help them with homework and homeschooling was certainly inconsistent with Dr. Hunt's opinion that Plaintiff could not even perform one-to-two step tasks." (*Id.* at 12.) Third, the Commissioner states that "[t]he ALJ also noted that Dr. Hunt reported that Plaintiff had audiovisual hallucinations, but this was inconsistent with Dr. Miller's testimony that there were no signs of hallucinations in the record, other than Plaintiff's self-reports. Dr. Miller testified that Plaintiff's mental health providers did not agree that Plaintiff had hallucinations and that there was no evidence of chronic hallucinations or psychotic disorder in Plaintiff's treatment notes." (*Id.* at 10-11.) Fourth, the Commissioner argues that the ALJ "permissibly rejected Dr. Hunt's opinions" based on Dr. Hunt's lack of psychiatric training and again emphasizes that Dr. Hunt's findings were inconsistent with her own examination findings. (*Id.* at 11.)

In reply, Plaintiff reiterates her earlier argument that, under the pre-2017 regulations, it was impermissible for the ALJ to discredit Dr. Hunt's opinions due to the fact that Dr. Hunt is not a psychiatric provider (Doc. 22 at 8); reiterates her earlier argument that the mere fact her "providers did not note *observations* of [her] hallucinations does not discount [her] consistent report of both auditory and visual hallucinations" (*id.* at 8-9); and reiterates her earlier argument that her childcare responsibilities do "not automatically show that Dr. Hunt's assessments were invalid" (*id.* at 9-10).

4. <u>Analysis</u>

The Court finds no harmful error in the ALJ's evaluation of Dr. Hunt's opinions. One of the ALJ's proffered reasons for discounting those opinions was their inconsistency with Dr. Hunt's own treatment notes and records. More specifically, the ALJ observed

that although Dr. Hunt opined that Plaintiff would have "cognitive or pace limits that inhibited her from completing more than one to two-step job duties over an[] eight-hour day and would be off task to a severe degree," Dr. Hunt's notes included observations of Plaintiff as having normal cognition, intact cognitive function, good judgment and insight, and a full range of mood/affect. (AR at 2179-81.) This conflict was a specific and legitimate reason for discounting Dr. Hunt's opinions. *See, e.g., Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020) ("A conflict between a treating physician's medical opinion and his own notes is . . . a specific and legitimate reason for rejecting it."); *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) ("A conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider."); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) ("The incongruity between Dr. Nachenberg's Questionnaire responses and her medical records provides an additional specific and legitimate reason for rejecting Dr. Nachenberg's opinion of Tommasetti's limitations."). Notably, in her briefs on appeal, Plaintiff makes no effort to address this portion of the ALJ's analysis, even though the Commissioner specifically identified it as a basis for affirmance (Doc. 21 at 10).

It was also permissible for the ALJ to discount Dr. Hunt's opinions based on their inconsistency with Plaintiff's efforts to provide childcare for her sister's and cousin's children. *See, e.g., Ford*, 950 F.3d at 1155 ("A conflict between a treating physician's opinion and a claimant's activity level is a specific and legitimate reason for rejecting the opinion."). Plaintiff stated that her childcare activities included such tasks as helping children with online schooling, caring for a toddler who needed potty training, cooking, and cleaning. (AR at 2621, 2631, 2634, 2689, 2691, 2718, 2736, 2869, 2883, 2973.) Although Plaintiff emphasizes that she only engaged in those childcare activities during a portion of the alleged period of disability, it was still rational for the ALJ to construe them as inconsistent with Dr. Hunt's opinions that Plaintiff could not perform more than one- or two-step tasks and would be off-task to a severe degree (AR at 2046, 2886).

These determinations make it unnecessary to evaluate the sufficiency of the ALJ's

other proffered reasons for discrediting Dr. Hunt's opinions. Even if, as Plaintiff contends, the other reasons were legally insufficient or unsupported by substantial evidence, any error was harmless in light of the ALJ's error-free decision to discredit Dr. Hunt's opinions based on their inconsistency with Dr. Hunt's observations and with Plaintiff's own description of her activities. *See, e.g., Reed v. Saul*, 834 F. App'x 326, 329 (9th Cir. 2020) ("The ALJ discounted the opinion of Dr. Cochran because the opinion was (1) excessive and inconsistent with the clinical findings in the record; (2) based largely on Reed's self-reports, rather than objective clinical findings; and (3) not supported by the prescribed treatment. To the extent the ALJ erred in discounting the opinions of Dr. Cochran because her opinions were based in part on Reed's self-reports of his symptoms, that error is harmless because the ALJ offered multiple other specific and legitimate reasons for discounting Dr. Cochran's opinions."); *Baker v. Berryhill*, 720 F. App'x 352, 355 (9th Cir. 2017) ("Two of the reasons the ALJ provided for discounting examining psychologist Dr. Wheeler's opinion were not legally valid . . . [but] Baker has not shown these errors affected the ALJ's ultimate nondisability determination, as the ALJ provided other specific and legitimate reasons for discounting Dr. Wheeler's opinion . . . . As a result, any error was harmless."); *Presley-Carrillo v. Berryhill*, 692 F. App'x 941, 944-45 (9th Cir. 2017) ("The ALJ also criticized Dr. Van Eerd's opinion in part because Dr. Van Eerd did not define the terms 'mild,' 'moderate,' or 'severe' in his assessment. This criticism was improper . . . [but] this error was harmless because the ALJ gave a reason supported by the record for not giving much weight to Dr. Van Eerd's opinion—specifically, that it conflicted with more recent treatment notes from Dr. Mateus."). *Cf. Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) ("Because we conclude that two of the ALJ's reasons supporting his adverse credibility finding are invalid, we must determine whether the ALJ's reliance on such reasons was harmless error. . . . [T]he relevant inquiry in this context is not whether the ALJ would have made a different decision absent any error, it is whether the ALJ's decision remains legally valid, despite such error. . . . Here, the ALJ's decision finding Carmickle less than fully credible is valid, despite

the errors identified above.”).

B. **NP Pray**

1. Standard Of Review

At the time Plaintiff filed her applications, a nurse practitioner was not an “acceptable” medical source. *Popa v. Berryhill*, 872 F.3d 901, 907 (9th Cir. 2017). Thus, to reject the opinions of NP Pray, the ALJ only needed to provide “germane” reasons. *Id.* at 906.

2. The ALJ’s Evaluation of NP Pray’s Opinions

The ALJ concluded that “minimal weight” should be assigned to NP Pray’s opinions. (AR at 2174-77.) The ALJ provided the following nine-paragraph explanation for this determination, which spanned three full pages of the underlying decision[4]:

> The undersigned considered the opinion of Stephen Pray, NP (Exs. 7F, 16F). On December 18, 2013, Stephen Pray, N.P. completed a Medical Source Statement. Nurse Pray reported the claimant had a severe degree of impairment in her ability to relate to other people; a mild limitation in her ability to understand, carry out and remember instructions and perform simple tasks; a moderate limitation in her ability to respond appropriately to supervisors; a moderately severe limitation in her ability to respond appropriately to coworkers; a severe impairment in her ability to respond appropriately to customary work pressures; mild side effects from medication; and a moderately severe restriction in work pace. On July 7, 2014, Nurse Pray opined the claimant had a moderate restriction in her ability to understand, carry out and remember instructions and perform simple tasks and moderately severe limitations in her ability to respond appropriately to supervision and coworkers. He opined she had severe limitation in her ability to respond to customary work pressure and mild side effects to medication and a moderately severe restriction in sustainability of work pace. Nurse Pray stated the claimant was completely unable to work with even minimal expectations and severe mood instability (Ex. 16F).
>
> The undersigned is unable to assign more than minimal weight to Nurse Pray’s opinions for several reasons. There are inconsistencies between the two opinions, which render them less persuasive for any 12 month time

[4] Additionally, in an earlier portion of the decision, the ALJ also addressed NP Pray’s opinions. (AR at 2173-73.) That analysis overlaps with, but is less extensive than, the analysis excerpted in the body of this order.

period. Moreover, while treatment records support a finding that she had work related restrictions, the limitations reported by Nurse Pray are not supported.

On July 16, 2013, the claimant had a mental health assessment and reported she had anxious or worried most of the time (Exhibit 6F/1). She reported depression, anxiety and frequent auditory and visual hallucinations (Id.). The claimant also reported a history of polysubstance abuse with her drugs of choice being methamphetamine and marijuana (Id.). She reported she last used methamphetamine in August 2011 and marijuana two to three years ago (Id.). The claimant reported she was having knee surgery on July 3, 2013 (Id.). As previously stated, there were no treatment records provided to corroborate a knee surgery prior to 2020. She stated she last relapsed on methamphetamine on January 1, 2013 (Exhibit 19F/6). In August 2013, she continued to serve as her grandmother's primary caregiver with her sister (Exhibit 6F/12). She also reported her grandmother had dementia (Id.). Caring for an individual with dementia can be quite demanding both physically and emotionally. The claimant's ability to do so, strongly suggests she was not as limited as alleged. The claimant did not appear for a scheduled appointment in October 2013 (Exhibit 6F/11). The claimant subsequently reported her grandmother had a fall on October 1, 2013, and that she had been placed into a nursing home (Id.). On November 23, 2013, the claimant reported hallucinations but her thought content was nonpsychotic and associations logical (Exhibit 6F/9). The claimant reported major insomnia and she presented as anxious, dysphoric with a constricted affect (Exhibit 6F/8). The family had put her grandmother's house up for sale and the claimant would have to move out by January 1st (Id.). The claimant reported having a nervous breakdown when hearing about this and also auditory and visual hallucinations (Id.). There is very little evidence of mental health treatment from November 2013 to April 2014. The claimant did receive medical treatment during this time period but the treatment records do not indicate any observations of mental health limitations.

During a treatment visit at Desert Oncology on January 20, 2014, and February 17, 2014, the claimant was observed to have a normal mood and affect (Exhibits 10F/2 and 13F). The claimant stated she was single and used to live with her grandmother but now lived alone after her grandmother moved to a group home (Exhibit 10F/1). On February 12, 2014, the claimant reported to an examining physician for the State agency that she was living with her sister (Exhibit 12F/2). She was observed to have a normal mood and affect (Id.). Similarly, during appointments with a primary care provider in October 2013 and July 2014, she was observed to have an appropriate mood and affect and to be oriented times three (Exhibits 18F/9 and 18F/15).

She denied anxiety and depression (Exhibit 18F/14 and 18F/17). On March 18, 2014, she presented to a primary care provider after a reported emergency room visit (Exhibit 18F/12). She asked if he could refill Ativan (Id.). The claimant's requested Ativan was denied and her primary care provider advised her to discuss anti anxiety medication with her psychiatrist (Exhibit 18F/13).

On April 3, 2014, at an appointment at People of Color Network, it was noted she was low risk and noted to have borderline personality disorder (Exhibit 15F). However, the claimant reported hallucinations and she presented as dysphoric and with a constricted affect (Id.). Mental status exam revealed she was quiet and logical with fair memory and concentration and limited judgement and concentration (Id.). She reported moderate and frequent auditory and visual hallucinations (Exhibit 15F/1).

By June 23, 2014, the claimant reported things were more stable since moving in with her mother in May (Exhibit 19F/32). Her biggest stressor was not being able to have the dog at her mother's house (Id.). The claimant reported depression and anxiety and reported a knee surgery in July 2013 to repair a torn meniscus (Id.). These records were not provided. Mental status examination during that visit indicated the claimant was well groomed with no hallucinations reported (Exhibit 19F/33). Her insight was good, but judgement limited and concentration and insight fair. The claimant's muscle strength and tone appeared normal (Exhibit 19F/33). On July 15, 2014, she reported barriers to employment were her physical health issues (Exhibit 19F/21). She also reported smoking marijuana presently (Exhibit 19F/22). She was living with her mother and stepfather and maintained contact with her sister and enjoyed spending time with her sister, surfing the web and playing video games (Exhibit 19F/20). The claimant reported routinely smoking marijuana (Exhibit 19F/16). The claimant reported an interest in part[] time work and was referred to the Marc Center for work adjustment and job development (Exhibit 19F/15).

On September 23, 2014, the claimant reported depression, anxiety and panic attacks while sleeping (Exhibit 19F/9). Her biggest stressor was living with her mother and not being allowed to have her dog at her mother's due to expense (Exhibit 19F/9). She reported she was starting to work at the Marc Center beginning the next day and she started in home counseling with a counselor from Southwest Behavioral (Id.). The claimant reported ongoing auditory and visual hallucinations (Id.). Mental status examination revealed fair concentration, memory and fund of knowledge (Exhibit 19F/10). She was quite calm and cooperative, but she was observed to be disheveled and had limited insight and judgement (Id.). On November 24, 2014, she presented as dysphoric and with a constricted affect (Exhibit 19F/5). Her

biggest reported stressor was not being able to find a job and vocational rehabilitation not returning her phone calls (Id.). In addition, she was not able to stay at her sister's overnight anymore after breaking the couch (Id.). She felt ambivalent about counseling through Southwest Behavioral and was putting minimal effort into counselling (Id.). There is little evidence of counseling through Southwest Behavioral until 2018. The claimant reported occasional auditory hallucinations of hearing her name called out (Id.). She was observed to be dressed appropriately and casually groomed (Exhibit 19F/6). She was quite calm cooperative with logical associations (Id.). The claimant had a fair memory and concentration and limited insight and judgment (Id.).

On March 18, 2015, the claimant presented as dysphoric and with a constricted affect when she reported her grandmother died on January 27, 2015 (Exhibit 19F/1). It was noted she quit counseling earlier this week and she demonstrated poor insight and used poor judgement regarding her mental illness (Id.). At that time, she stated she did not want to change her life and reported auditory hallucinations of her grandmother calling her name (Id.). She stated she had been off her medication two weeks and unable to get refills (Id.). However, on March 20, 2015, the claimant requested a letter from her primary care physician that stated she was the main caretaker for her stepfather who had multiple medical problems and she was taking him to and from his doctors' appointments and that she should be excused from attending job/employment search activities (Exhibit 21F/13). These activities strongly suggest she was not as limited as alleged. In June 2015, she reported depression and anxiety (Exhibit 20F/8). The claimant reported lack of concentration and social isolation (Id.). At that time, she was seen by Stephen Jaffe, M.D. (Id.). In August 2015, she presented as depressed but answered the assessment questions linear and logically (Exhibit 20F/2)).

In summary, while Nurse Pray was a treating mental health provider, his opinions are not consistent with the record. He reported she had a severe degree of impairment in her ability to relate to other people (Exhibit 7F/1). However, she also reported during that time period she was serving as a caregiver to her grandmother along with her sister as noted above. In the subsequent opinion, Nurse Pray opined she had a moderately severe degree of impairment in her ability to relate to other people (Exhibit 16F). However, less than 12 months after completing the opinion, the claimant stated she was serving as caregiver to her stepfather and taking him to and from appointments. She also reported living with her mother and sister and there were no significant problems reported. These factors are not consistent with Nurse Pray's opinion regarding the claimant's ability to relate to other people. Nurse Pray indicated she would have a severe ability to respond to

> customary work pressure (Exhibit 7F and 16F). However, she served as her grandmother's caregiver until her grandmother had a fall and she reported serving as her stepfather's caregiver. Caring for individuals with dementia and physical impairments can be quite demanding. Her ability to do so, is inconsistent with Nurse Pray's opinion. Stephen Pray stated the claimant had frequent episodes of severe mood instability (Exhibit 16F). However, she was observed to have a normal mood and affect during treatment with her medical providers and she denied depression and anxiety. Lastly, Nurse Pray stated the claimant had no current issues of substance abuse, but there are multiple statements to Nurse Pray that she was using marijuana regularly and no indication of a medical marijuana card (Ex. 6F/26, 7F). The claimant reported erroneous information to Nurse Pray and this at least raises the question whether additional information she was provided was similarly unreliable. Given the above factors, the undersigned has assigned minimal weight to Nurse Pray's opinions and finds they are not persuasive.

(*Id.*)

3. The Parties' Arguments

Plaintiff argues that the ALJ failed to provide germane reasons for discrediting the opinions of NP Pray. (Doc. 19 at 18-22.) First, Plaintiff argues that the ALJ erred by focusing on her efforts to serve as a caregiver for her grandmother because those efforts occurred before the alleged onset date. (*Id.* at 18-21.) Plaintiff also contends although the ALJ identified later records referencing additional caregiving activities, those records were vague as to how long she helped family members during a typical day or week, what her duties actually were, or whether any of those tasks would equate to the ability to sustain full-time work. (*Id.*) Plaintiff further contends that the ALJ "failed to explain how [her] living arrangement(s) or how her contribution to her grandmother's, sister's, or stepfather's care was inconsistent with any of NP Pray's specific assessed limitations." (*Id.*) Second, Plaintiff argues that the mere fact she "had a normal mood and affect at some treatment visits fails to show that NP Pray's assessments were inconsistent with this record. Citing to normal findings in the record while ample, abnormal findings also exist, and without any explanation of how one set of findings cancels out the significance of the other findings, fails to show NP Pray's assessment was inconsistent with this record." (*Id.* at 21-22.) Third, as for the alleged inconsistency between her marijuana use and NP Pray's

opinions, Plaintiff argues that the records cited by the ALJ do not establish substance *abuse* and that "even intermittent marijuana use . . . does not invalidate NP Pray's assessed limitations." (*Id.* at 22.)

In response, the Commissioner defends the sufficiency of the ALJ's rationale for discrediting NP Pray's opinions. (Doc. 21 at 4-8.) As an initial matter, the Commissioner argues that although "Plaintiff claims that the ALJ rejected NP Pray's opinions based on three reasons: (1) her ability to care for her relatives, including a grandmother with dementia; (2) mental status findings, such as normal mood and affect; and (3) NP Pray's report that Plaintiff was not using substances contradicted evidence that she was using marijuana," "[t]he ALJ actually gave multiple reasons to reject NP Pray's opinions, including the reasons above." (*Id.* at 5.) As for Plaintiff's caregiving activities, the Commissioner contends that although one of the treatment notes cited by the ALJ was dated February 2013 (which falls before the alleged August 2013 onset date), Plaintiff's grandmother was not moved into a nursing home until November 2013, which suggests the caregiving activities continued after the alleged onset date. (*Id.* at 6.) As for the NP Pray's mental status findings, the Commissioner notes that during an examination in June 2014, Plaintiff "denied any and all current psychiatric symptoms, including no delusions or hallucinations, and Plaintiff was quiet, cooperative and calm, with logical thought processes, good eye contact, and normal speech." (*Id.*, citing AR at 721.) The Commissioner also contends that "[t]he ALJ was not required to explain how the normal findings outweighed the abnormal findings. Instead, she was required to resolve ambiguities in the medical evidence, which she did here, and reasonably found that the overall evidence showed that Plaintiff did not have work preclusive limitations." (*Id.* at 7.) As for Plaintiff's marijuana use, the Commissioner argues that "Plaintiff reported routinely smoking marijuana, including to NP Pray himself" and "[t]his was inconsistent with NP Pray's opinions, since he stated that Plaintiff was not using substances." (*Id.* at 6.) The Commissioner continues: "Plaintiff argues that this was not relevant because NP Pray noted that the assessed limitations would remain absent any substance abuse. But this was

a separate issue. The ALJ concluded that, since Plaintiff was reporting erroneous information to NP Pray, this suggests that other information Plaintiff was reporting was similarly unreliable." (*Id.* at 6-7.) Finally, the Commissioner states that "the ALJ found an additional inconsistency because, in March 2015, Plaintiff requested a letter from her doctor stating that she was the main caretaker for her stepfather, who had multiple medical problems, and that she was taking him to his doctor's appointments, and that she should be excused from attending job/employment search activities. Such abilities were inconsistent with NP Pray's opinions. Plaintiff argues that no details were provided aside from driving her stepfather to appointments, but Plaintiff also stated that she was the main caretaker for her stepfather, which suggests that she was doing more than driving." (*Id.* at 7.)

In reply, Plaintiff reiterates her earlier argument that "no details of exactly what [her] caretaking duties were are included in this record" (Doc. 22 at 4); acknowledges that she once reported serving as the "main caretaker" for her stepfather but contends that "[v]ague notations of caring for or helping to care for various family members throughout the relevant period without details as to the length or frequency or of the actual tasks involved fails to rise to the level of germane reasons relevant to the assessment to reject a treating provider's assessment" (*id.* at 5); argues that "[t]he ability to assist family members with mostly unexplained tasks for an undisclosed amount of time is not the same thing as the ability to sustain work" (*id.* at 6); and reiterates her earlier argument that "[c]iting to normal findings in the record while ample, abnormal findings also exist, and without any explanation of how one set of findings cancels out the significance of the other findings, fails to show NP Pray's assessment was inconsistent with this record" (*id.*).

4. <u>Analysis</u>

The Court finds no harmful error in the ALJ's evaluation of NP Pray's opinions. As an initial matter, although Plaintiff contends the ALJ only identified three reasons for discrediting NP Pray's opinions (i.e., inconsistency with Plaintiff's caregiving activities, inconsistency with normal mental status findings, and inconsistency with Plaintiff's marijuana use) and then proceeds to challenge the sufficiency of those three reasons, the

Court agrees with the Commissioner (Doc. 21 at 5) that the ALJ's reasoning was not so limited. For example, the ALJ also discredited NP Pray's opinions because "[t]here are inconsistencies between the two opinions, which render them less persuasive for any 12 month time period." (AR at 2173-74.) By ignoring this aspect of the ALJ's analysis, Plaintiff has forfeited any objection to it, and this alone provides a basis for affirmance.

At any rate, the ALJ's analysis was also free of harmful error for other reasons. Under Ninth Circuit law, "an opinion's inconsistency with a claimant's daily activities meets the germane standard." *Oliver H. v. Saul*, 2020 WL 5745816, *3 (E.D. Wash. 2020) (citations omitted). Another of the ALJ's proffered reasons for discrediting NP Pray's opinions was that "on March 20, 2015, [Plaintiff] requested a letter from her primary care physician that stated she was the main caretaker for her stepfather who had multiple medical problems and she was taking him to and from his doctors' appointments and that she should be excused from attending job/employment search activities. These activities strongly suggest she was not as limited as alleged." (AR at 2176.) Plaintiff's only objection to this analysis is that the record does not contain detailed information about exactly what her caretaking duties were or how much time they occupied. This may be true, but the bottom line is that Plaintiff described herself as her stepfather's "main caretaker." (AR at 752.) It was rational for the ALJ to find an inconsistency between that activity and NP Pray's work-preclusive opinions, which included opinions that Plaintiff had severe limitations in relating to others and moderate limitations in carrying out simple tasks. And "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas*, 278 F.3d at 954.

These determinations make it unnecessary to evaluate the sufficiency of the ALJ's other proffered reasons for discrediting NP Pray's opinions. *See, e.g., Reed*, 834 F. App'x at 329; *Baker*, 720 F. App'x at 355; *Presley-Carrillo*, 692 F. App'x at 944-45.

…

…

C. **NP Hammond**

1. Standard Of Review

As noted in Part IV.B.1 above, the ALJ only needed to provide "germane" reasons to reject the opinions of NP Hammond.

2. The ALJ's Evaluation of NP Hammond's Opinions

The ALJ concluded that "minimal weight" should be assigned to NP Hammond's opinions. (AR at 2177-78.) The ALJ provided the following rationale for that decision:

> The undersigned considered the opinion of Brandy Hammond, N.P. (Ex. 23F). On November 18, 2015, Nurse Hammond completed a medical assessment. Ms. Hammond opined the claimant had a severe degree of deterioration in personal habits, a severe limitation in her ability to understand, remember and carry out instructions, respond appropriately to supervision, coworkers and to customary work pressure. She opined the claimant had a moderately severe limitation in her ability to perform simple tasks and a moderately severe limitation due to side effects from prescribed medication. Her symptoms affected the sustainability of work pace to a severe degree and her psychiatric symptoms were exacerbated to a severe degree by a general medical condition such as pain or fatigue. Ms. Hammond's opinion is given minimal weight. Although she is a treating nurse practitioner, she does not appear to have a significant treating history with the claimant during the period at issue. The record shows that she saw the claimant only twice in November 2015 and January 2016 (Ex. 26F). Ms. Hammond opined the claimant's condition was exacerbated to a severe degree by a general medical condition, but as discussed elsewhere in this decision, the claimant reported good results with pain medication and denied adverse side effects from medication. In addition, in March 2015, the claimant reported she was the primary caretaker for her stepfather who had multiple medical issues and she was taking him to and from medical appointments and caring for him (Ex. 21F/13). She requested a letter stating this was a case and wanted to be excused from attending job and employment search activities (Id.). During her two appointments, Ms. Hammond observed fair memory, insight, judgement and concentration and normal muscle strength and tone, which would not explain the severe limitations alleged (Ex. 26F/2 and 7). While she assessed the claimant with moderately severe to severe mental health restrictions, her own mental status exams are inconsistent and reveal the claimant maintained logical thought process and associations and fair fund of knowledge, memory, insight, judgment and concentration (Ex. 26F/2, 7).

(*Id.*)

3. The Parties' Arguments

According to Plaintiff, the ALJ provided four reasons for discrediting the opinions of NP Hammond: "The ALJ rejected NP Hammond's assessment based on the ALJ's belief that (1) NP Hammond's treatment of [Plaintiff] was limited to two visits (November 2015 and January 2016); (2) NP Hammond's opinion that [Plaintiff's] psychiatric symptoms were exacerbated by her general medical condition was inconsistent with the records, (3) in March 2015, [Plaintiff] 'reported she was the primary caretaker for her stepfather who had multiple medical issues and she was taking him to and from medical appointments and caring for him (Ex. 21F/13)' and requested a letter excusing her from job search, and (4) the assessment was inconsistent with mental status examinations." (Doc. 19 at 22-23.) Plaintiff argues that the first reason was insufficient because NP Hammond also reviewed the treatment notes from Plaintiff's visits with other providers (*id.* at 23); that the second reason was insufficient because even if "that one line [of NP Hammond's opinion] was inconsistent with the records that showed [Plaintiff's] physical pain improved with medication," that inconsistency "did little to discount NP Hammond's assessment that [Plaintiff's] psychiatric impairments caused severe limitations in her abilities to understand, remember, and carry out instructions, respond appropriately to supervisors and coworkers, and respond to customary work pressures" (*id.*); that the third reason was insufficient because the record contains few "details as to [the] frequency and length of" her caretaking activities (*id.* at 23-24); and the fourth reason was insufficient because "the ALJ ignored positive findings on mental status examinations" and engaged in impermissible cherry-picking (*id.* at 24).

In response, the Commissioner argues that the ALJ permissibly discredited NP Hammond's opinions because they were "not well-supported by her own treatment notes and by her minimal treatment relationship, and [were] inconsistent with the overall record, including Plaintiff's ability to be the main caretaker for her stepfather around the time NP Hammond rendered the opinion." (Doc. 21 at 8.) As for the minimal treatment

relationship, the Commissioner argues that even if NP Hammond reviewed other providers' notes, "NP Hammond's treatment notes failed to support disabling mental limitations." (*Id.*) As for NP Hammond's opinion that Plaintiff's psychiatric symptoms were exacerbated by her physical symptoms, the Commissioner argues that the record undermines this opinion and that Plaintiff's arguments to the contrary simply represent "her alternative view of the record." (*Id.* at 8-9.) As for Plaintiff's caretaking activities, the Commissioner argues that Plaintiff's arguments on appeal only reveal further inconsistencies. (*Id.* at 9.) And as for the cherry-picking accusation, the Commissioner contends that "the ALJ acknowledged abnormal mental status findings, but determined that the overall record did not support disabling limitations" and that "Plaintiff herself 'cherry picks' evidence." (*Id.*)

In reply, Plaintiff essentially reiterates the arguments from her opening brief and contends that the Commissioner's counter-arguments are either non-responsive or inaccurate. (Doc. 22 at 6-8.)

4. <u>Analysis</u>

The Court finds no harmful error in the ALJ's evaluation of NP Hammond's opinions. As discussed above in relation to NP Pray, it was rational for the ALJ to find a contradiction between Plaintiff's description of herself as her stepfather's "main caretaker" and NP Hammond's work-preclusive opinions regarding Plaintiff's ability to understand, remember, and carry out instructions. Under Ninth Circuit law, this was a germane reason to discredit NP Hammond's opinions. *Oliver H.*, 2020 WL 5745816 at *3.

Although the analysis could end there, it was also rational for the ALJ to find a contradiction between NP Hammond's opinion that Plaintiff's "condition was exacerbated to a severe degree by a general medical condition" (AR at 761) and the evidence that Plaintiff reported good results with pain medication and denied adverse side effects from medication. (*See, e.g.*, *id.* at 1700 ["stable on pain medication . . . down to 3/10 with pain medication"]; *id.* at 1703, 1706, 1709 [same]; *id.* at 1919 ["stable on pain medication . . . down to 2/10 with pain medication"]; *id.* at 1922 [same].) Although Plaintiff contends the

ALJ could have overlooked this contradiction and accepted NP Hammond's opinions on other topics, it was rational for the ALJ to discredit all of NP Hammond's opinions based on the existence of this inconsistency.

These determinations make it unnecessary to evaluate the sufficiency of the ALJ's other proffered reasons for discrediting NP Hammond's opinions. *See, e.g., Reed*, 834 F. App'x at 329; *Baker*, 720 F. App'x at 355; *Presley-Carrillo*, 692 F. App'x at 944-45.

D. **Conclusion**

The Court recognizes that this case represents Plaintiff's third appeal from the denial of Social Security benefits and that Plaintiff prevailed during her previous two appeals, but the record here is significantly different than before. Notably, Plaintiff no longer challenges the ALJ's decision to discredit her symptom testimony. Additionally, although the ALJ's reasoning for discrediting the opinions of Dr. Hunt and NPs Pray and Hammond[5] was previously found to be deficient, the ALJ expanded upon that reasoning in the underlying decision—and, as discussed above, Plaintiff repeatedly fails to acknowledge the full extent of the ALJ's expanded reasoning. On this record, affirmance is required.

**IT IS THEREFORE ORDERED** that the decision of the Commissioner of Social Security is **affirmed**. The Clerk is directed to enter judgment accordingly.

Dated this 21st day of September, 2026.

Dominic W. Lanza
United States District Judge

---

[5] As noted in earlier portions of this order, although Judge Rayes concluded during Plaintiff's first appeal that the ALJ provided insufficient reasons for discrediting the opinions of NPs Pray and Hammond, Judge Brnovich concluded during Plaintiff's second appeal that the ALJ's new analysis regarding NPs Pray and Hammond was free of harmful error.